IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **TAMMY HURLEY WALKER,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | ) Case No. 14-cv-586-CJP[1] |
| | ) |
| **CAROLYN W. COLVIN,** | ) |
| **Acting Commissioner of Social** | ) |
| **Security,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Tammy Hurley Walker, represented by counsel, seeks judicial review of the final agency decision denying her Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

## Procedural History

Ms. Walker applied for benefits in December, 2011, alleging disability beginning on May 18, 2007.  (Tr. 20).  After holding an evidentiary hearing, ALJ Bradley L. Davis denied the application for benefits in a decision dated May 30, 2013.  (Tr. 20-31).  The Appeals Council denied review, and the decision of the ALJ became the final agency decision.  (Tr. 1).  Administrative remedies have been exhausted and a timely complaint was filed in this Court.

---

[1] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c).   See, Doc. 13.

**Issues Raised by Plaintiff**

Plaintiff raises the following points:

1. The ALJ ignored evidence that was inconsistent with his conclusion regarding plaintiff's mental limitations.

2. The ALJ failed to specify the weight he gave to Dr. Ungacta's opinion.

3. The ALJ ignored plaintiff's diagnoses of bipolar disorder and panic disorder.

**Applicable Legal Standards**

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. §§ 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals

has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at

step five to show that the claimant can perform some other job.  *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).   *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7<sub>th</sub> Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.   It is important to recognize that the scope of review is limited.   "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g).  Thus, this Court must determine not whether Ms. Walker was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.   See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).   This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.   *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).   However, while

judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.  See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### The Decision of the ALJ

ALJ Davis followed the five-step analytical framework described above.  He determined that Ms. Walker had not been engaged in substantial gainful activity since the date of her application, and that she was insured for DIB only through March 31, 2010.  He found that plaintiff had severe impairments of degenerative disc disease, chronic pain syndrome, history of right carpal tunnel syndrome, history of right knee surgery, obesity, major depressive disorder, and obsessive-compulsive disorder.  He further determined that these impairments do not meet or equal a listed impairment.

The ALJ found that Ms. Walker had the residual functional capacity (RFC) to perform work at the light exertional level, with a number of physical and mental limitations.  For mental limitations, the ALJ restricted plaintiff to simple, routine and repetitive tasks and only superficial interaction co-workers and the public, "meaning work dealing with things rather than people."  Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to do her past work.  However, she was not disabled because there were other jobs that she could do, such as mailroom clerk, housekeeper/laundry worker and production assembler.

### The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff and is confined to the relevant time period.

### 1. Agency Forms

Ms. Walker was born in 1972 and was 35 years old on the alleged onset date. She was insured for DIB only through March 31, 2010. (Tr. 165). She had previously worked as a cook/kitchen supervisor at Parks College and as a cashier/clerk/floor supervisor in a hardware store. (Tr. 169).

Plaintiff filed a Disability Report in December, 2011, in which she said her ability to work was limited by a number of mental and physical conditions, including depression and anxiety. She said that she stopped working in May, 2004, because she began experiencing depression and social anxiety after her sister committed suicide. (Tr. 167-168).

### 3. Evidentiary Hearing

Ms. Walker was represented by an attorney at the evidentiary hearing on May 14, 2013. (Tr. 39).

Plaintiff testified that she "went into a deep depression" after her sister committed suicide in May, 2004, and she remained in a state of depression since then. (Tr. 43). She began seeing a doctor for anxiety and depression in about 2008. She testified that she had severe depression, anxiety and OCD. She was

seeing Dr. Hutchins at the time of the hearing and he changed her medications a lot. She was taking Xanax, Wellbutrin, and Paxil for depression and anxiety. She was also taking Gabapentin for neuropathy, Vicodin for pain and another medication for loss of bladder control. (Tr. 49-50).

A vocational expert (VE) also testified. The ALJ asked her to assume a person of plaintiff's age, education and work experience, who could do work at the light exertional level, with limitations that corresponded to the ultimate RFC assessment. The VE testified that this person could not do plaintiff's past work as a waitress, but she could do other jobs that exist in significant numbers in the national and regional economy. (Tr. 60-61).

### 3. Medical Records

There are very few medical records for the period before plaintiff's date last insured, March 31, 2010.

Ms. Walker began seeing Dr. V. Jose Thomas, a psychiatrist, in February, 2008. The initial diagnosis was Bipolar II Disorder.[2] Plaintiff continued to see Dr. Thomas through November, 2009. The doctor changed her medications several times to address her ongoing symptoms. He first prescribed Lamictal and Xanax. The dose of Xanax was increased in March, 2006, to control her anxiety. The next month, the doctor diagnosed Obsessive Compulsive Disorder. He added

---

[2] Bipolar II Disorder is "defined by a pattern of depressive episodes and hypomanic episodes, but no full-blown manic or mixed episodes." Bipolar I Disorder is "defined by manic or mixed episodes that last at least seven days, or by manic symptoms that are so severe that the person needs immediate hospital care. Usually, depressive episodes occur as well, typically lasting at least 2 weeks." http://www.nimh.nih.gov/health/publications/bipolar-disorder-in-adults/index.shtml, visited on May 11, 2015.

Luvox and increased the dosage of Lamictal. In May, 2008, Dr. Thomas noted that plaintiff was "dusting only 4 times a day instead of 10 times." In August, 2008, she was described as "very depressed." The primary diagnosis was changed to Bipolar I Disorder. In September, 2008, the assessment was that her symptoms were getting worse. Dr. Thomas added Abilify to her other medications. In November, 2008, she was "slowly improving," but, by mid-December, 2008, she was "very depressed and tearful." One month later, she was again doing better. However, her symptoms were exacerbated after the dosage of Lamictal was reduced. By late February, 2009, she was "progressing well," and, in March, 2009, she was "mostly asymptomatic and in partial remission. She worsened again in April, 2009. Dr. Thomas noted that it was about the time of year that her sister had committed suicide. He assessed plaintiff as "highly symptomatic and in need of immediate attention and intervention with medication and psychotherapy." He added Wellbutrin to her other medications. The assessment was the same the next month. By mid-June, she was again "mostly in remission." Repeating the pattern, she was again "quite symptomatic" in August, 2009, but was "progressing well" by October. In November, 2009, Dr. Thomas added a diagnosis of panic disorder without agoraphobia. At the last visit in December, 2009, Ms. Walker was very anxious. She was prescribed Abilify. (Tr. 509-537).

Ms. Walker began seeing Dr. James Hutchins, a psychiatrist, after Dr. Thomas closed his office. She was first seen by Dr. Hutchins on March 12, 2010. She had been out of her medications for about a month and "her mood had

deteriorated and she is quite irritable." She was obsessively vacuuming and dusting her house. On exam, she was alert, oriented, cooperative and verbal. Her affect was bland and constricted, and her mood seemed depressed. Insight and judgment were intact. Dr. Hutchins diagnosed major depressive disorder and obsessive-compulsive disorder. He prescribed Abilify, Ambien, Wellbutrin and Xanax. (Tr. 310-312).

The next visit was on April 14, 2010, after the date last insured. Dr. Hutchins noted that plaintiff was doing better. Her Burns Depression Checklist had dropped from 64 down to 55. However, she was still "very obsessive" and had limited insight into her obsessiveness. He adjusted her medications and added Zoloft. (Tr. 308). Dr. Hutchins continued to see plaintiff regularly, and her condition waxed and waned. She was hospitalized in September, 2010, after a suicide attempt. (Tr. 295). In April, 2012, Dr. Hutchins noted that he had "finally" received Dr. Thomas' records, and that he disagreed with Dr. Thomas' diagnosis of bipolar II disorder. Dr. Hutchins felt that the correct diagnoses were major depressive disorder, recurrent, moderately severe and obsessive-compulsive disorder. (Tr. 412).

There are no records relating to treatment for physical impairments until after plaintiff's date last insured. She began seeing Dr. Felix Ungacta, an orthopedic surgeon, for right knee pain in September, 2011. X-rays showed osteoarthritis of the right knee. She had previous arthroscopic surgery on that knee in 2006. Dr. Ungacta administered a cortisone injection, which did little to

relieve her pain. (Tr. 504-506). MRIs of both knees showed complex tears of the posterior horn lateral meniscus in both knees. X-rays showed moderate narrowing of the medial and lateral tibiofemoral compartment in both knees. (Tr. 502). Dr. Ungacta performed arthroscopic surgery on the right knee in February, 2012. The postoperative diagnoses were medial and lateral meniscus tear and osteoarthritis involving the patellofemoral compartment. (Tr. 495). She initially did well following surgery, but, by April, 2012, she had tenderness and effusion of the knee. X-rays showed about 50% narrowing of the lateral tibial femoral joint space consistent with varus osteoarthritis. Dr. Ungacta aspirated fluid from the knee and gave her a cortisone injection. (Tr. 497-498).

    4.    **State Agency Consultant's RFC Assessment**

On March 1, 2012, Donald Henson, Ph. D., assessed plaintiff's mental RFC. The assessment was as of her date last insured, March 31, 2010. (Tr. 334). He used an agency form (Form SSA-4734-F4-SUP) that is commonly used for this purpose in social security cases. (Tr. 334-337). This form is referred to as the Mental Residual Functional Capacity Assessment, or MRFCA. Section I of the form consists of a list of mental activities. The consultant is asked to set forth his "summary conclusions" by checking a box to rate the severity of limitation as to each activity. Dr. Henson checked the box for "moderately limited" for a number of activities, including the ability to maintain attention and concentration for extended periods and the ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances. (Tr. 334). In

Section III of the form, the consultant is asked to explain his summary conclusions in narrative form. Dr. Henson noted that plaintiff was in treatment before the date last insured for symptoms of anxiety and depression, and that these symptoms would adversely affect her ability to "tolerate the pressure of or sustain the pace/persistence for detailed activities of a somewhat complicated nature." He went on to say, "Regardless, she performs a relatively wide range of chores, engages in leisure activities and possesses sufficient cognitive and attentional abilities to perform simple routine activities which are within the limits of her physical capabilities. Interpersonal skills and adaptive behaviors are not significantly limited." (Tr. 336).

### 5. Opinions of Drs. Hutchins and Ungacta

In May, 2012, Dr. Hutchins assessed plaintiff's mental limitations by filling out a form that was apparently provided to him by plaintiff's attorney. Dr. Hutchins indicated that plaintiff had poor or no ability to deal with work stress, function independently, or maintain attention and concentration. He also indicated that she had fair ability to understand and carry out simple instructions and good ability to deal with the public and relate to co-workers. (Tr. 345-348).

Dr. Ungacta assessed plaintiff's physical limitations by filling out a form in June, 2012. Among other limitations, he opined that Ms. Walker could stand/walk for only 4 hours a day and could never stoop, crouch, kneel or crawl. He did not say when these limitations began or how long they could be expected to continue. (Tr. 351-353).

## Analysis

The Court agrees with plaintiff that the ALJ ignored evidence favorable to plaintiff in assessing her mental RFC.

Acting as a as a state agency consultant, Dr. Henson assessed plaintiff's mental RFC. "State agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act." SSR 96-6p, at *2. The ALJ is required by 20 C.F.R. §§ 404.1527(f) and 416.927(f) to consider the state agency consultant's findings of fact about the nature and severity of the claimant's impairment as opinions of non-examining physicians; while the ALJ is not bound by the opinion, he may not ignore it either, but must consider it and explain the weight given to the opinion in his decision. See, *McKinzey v. Astrue*, 641 F.3d 884, 891(7th Cir. 2011).

ALJ Davis stated that he gave considerable weight to the opinions of Dr. Henson, "who opined that the claimant is able to perform simple, routine tasks while maintaining interpersonal skills." (Tr. 29). The ALJ failed to explain why he rejected Dr. Henson's opinion that that plaintiff had moderate difficulties in maintaining concentration, persistence and pace and in the ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances.

An ALJ may not selectively consider the evidence, identifying pieces of the evidence that support his conclusion while ignoring evidence that supports

plaintiff's position. The Seventh Circuit has termed this a "sound-bite" approach, and has held that it is "an impermissible methodology for evaluating the evidence." *Scrogham v. Colvin,* 765 F.3d 685, 698 (7th Cir. 2014).

Relying on *Johansen v. Barnhart*, 314 F.3d 283, 288 (7th Cir. 2002), the Commissioner argues that the ALJ was not required to address Dr. Henson's checkmarks in Section I of the MRFCA form because Dr. Henson translated his Section I findings into an opinion as to plaintiff's limitations in Section III. She argues that the ALJ's RFC assessment adequately accommodated plaintiff's mental limitations because he adopted Dr. Henson's opinion as set forth in Section III.

The Commissioner's position is directly contrary to *Yurt v. Colvin*, 758 F.3d 850 (7th Cir. 2014). *Yurt* was decided on July 10, 2014, well before the briefs were filed in this case, but was not cited by either party. In *Yurt*, as here, the state agency consultant checked boxes in Section I of the MRFCA form indicating that the plaintiff had moderate limitations in areas relating to maintaining concentration, persistence and pace. The Commissioner made the same argument there as she does here, relying on *Johansen*. However, the Seventh Circuit distinguished *Johansen*: "we allowed the hypothetical in *Johansen* to stand despite its omissions because its description of 'repetitive, low-stress work' specifically excluded positions likely to trigger the panic disorder that formed the basis of the claimant's limitations in concentration, persistence, and pace." *Yurt*, 758 F.3d at 858. *Johansen* is distinguishable from this case for the same reason that the Seventh Circuit distinguished it from *Yurt*.

Page **13** of **19**

The ALJ's assessment of plaintiff's RFC limited her to "simple, routine, and repetitive tasks," but did not address her limitations in maintaining concentration, persistence or pace. (Tr. 25). The hypothetical question posed to the VE mirrored the RFC findings. (Tr. 60-61). "As a general rule, both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Yurt, ibid.* In *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010), the Seventh Circuit held that, "In most cases, however, employing terms like 'simple, repetitive tasks' on their own will not necessarily exclude from the VE's consideration those positions that present significant problems of concentration, persistence and pace." *O'Connor-Spinner*, 627 F.3d at 620. The reason for this holding is that there is a distinction between "the ability to stick with a given task over a sustained period" and "the ability to learn how to do tasks of a given complexity." *Ibid.* In *Yurt*, the Court stated "[W]e have repeatedly rejected the notion that a hypothetical like the one here confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace." *Yurt*, 758 F.3d at 859.

Under *Yurt* and *O'Connor-Spinner*, if a claimant has limitations in maintaining concentration, persistence and pace, absent a situation like *Johansen*, those limitations must be spelled out in the RFC assessment and in the hypothetical question posed to the VE. This is not to say that ALJ Davis was required to find that Ms. Walker had such limitations. The failing here is that ALJ Davis ignored

Dr. Henson's opinion to that effect. While he was not required to accept Dr. Henson's opinion in that regard, he was required to confront that evidence and explain the weight he gave to it. The Seventh Circuit has "repeatedly held that although an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014).

The same analysis applies to the ALJ's consideration of Dr. Hutchins' opinion. The ALJ acknowledged that Dr. Hutchins opined that plaintiff's limitations included poor ability to maintain attention and concentration and to deal with work stress. (Tr. 29). However, in weighing Dr. Hutchins' opinion, he said only that he gave "some weight" to Dr. Hutchins' opinion "insofar as he indicated . . . that the claimant has fair ability to understand, remember and carry out simple instructions with good ability to deal with the public and relate to co-workers." (Tr. 29). He said nothing at all about the rest of the opinion.

The Commissioner again argues that the ALJ accommodated the limitations in concentration by limiting plaintiff to simple, routine and repetitive tasks. However, that argument is foreclosed by *Yurt* and *O'Connor-Spinner*.

"An ALJ who chooses to reject a treating physician's opinion must provide a sound explanation for the rejection." *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). ALJ Davis gave two reasons for giving less weight to Dr. Hutchins' opinion. (Tr. 29). First, he said that all of the treating doctors' opinions were

recorded on pre-printed forms provided by the claimant's attorney. However, it is error to reject a treating doctor's opinion because it was solicited by the claimant's lawyer. *Punzio v. Astrue,* 630 F.3d 704, 712-713 (7th Cir. 2011). The second reason was that Dr. Hutchins started seeing plaintiff shortly before plaintiff's date last insured, and he gave his opinion after that date. While that might be a reason to reject the whole of Dr. Hutchins' opinion, it does not serve as a sound explanation for accepting part and rejecting part.

The ALJ is not permitted to "cherry-pick" the evidence, ignoring the parts that conflict with his conclusion**.** *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009). While he is not required to mention every piece of evidence, "he must at least minimally discuss a claimant's evidence that contradicts the Commissioner's position." *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000).

The ALJ is required to build a "logical bridge" from the evidence to his conclusions. *Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009). ALJ Davis simply failed to do so here. Instead, he presented only a "skewed version of the evidence." *Moore*, 743 F.3d at 1123. As a result, his decision is lacking in evidentiary support and must be remanded. *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012).

Because this case must be remanded based on errors in analyzing the evidence regarding plaintiff's mental limitations, the Court will not discuss in detail the ALJ's handling of the evidence regarding her physical limitations. The Court must point out, though, that the ALJ failed to adequately consider Dr. Ungacta's

opinion.

The ALJ did not discuss Dr. Ungacta's opinion in any detail. He made the general statement that he gave less weight to all of the treating doctors' opinions because they were recorded on pre-printed forms provided by the claimant's attorney. That is, of course, error. *Punzio, supra.* Secondly, he noted that the opinions were rendered "well after the date last insured." (Tr. 29).

The Commissioner argues that the ALJ was entitled to reject Dr. Ungacta's opinion because he did not begin to treat plaintiff until well after her date last insured. This argument does not take into account the nature of Dr. Ungacta's diagnoses.

Dr. Ungacta diagnosed osteoarthritis and meniscus tears in both knees. "Osteoarthritis (OA) is a noninflammatory form of arthritis . . . [which] involves both degenerative and regenerative processes." Manal Hasan, M.B.B.S., M.D., and Rhonda Shuckett, M.D., <u>Clinical Features and Pathogenetic Mechanisms of Osteoarthritis of the Hip and Knee</u>, British Columbia Medical Journal (October, 2010),http://www.bcmj.org/article/clinical-features-and-pathogenetic-mechanisms-osteo%C2%ADarthritis-hip-and-knee, visited on May 13, 2015. "The identification of OA on plain X-rays means there is already full thickness cartilage loss and even bone-on-bone contact. These radiographic findings occur relatively late in the course of OA." *Ibid*.

On the first visit with Dr. Ungacta, x-rays showed "findings consistent with osteoarthritis of the right knee." (Tr. 507). The Commissioner's brief and the

ALJ's decision do not consider the fact that the osteoarthritis in plaintiff's knees developed over time. This does not mean, of course, that plaintiff had osteoarthritis in her knees as of the date last insured, or that she suffered any significant symptoms related to that condition before her insured status ended. The Court is simply pointing out that, in view of the nature of the condition, it is not sufficient for the ALJ to cast aside Dr. Ungacta's opinion because he did not begin treating plaintiff until her date last insured. A more thorough analysis is required.

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Ms. Walker was disabled as of the relevant date or that she should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Tammy Hurley Walker's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence <u>four</u> of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:   May 13, 2015.**

s/ Clifford J. Proud
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**